**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 21-CR-20495-KMW

UNITED STATES OF AMERICA,

    Plaintiff,

v.

MICHAEL VAN NOSTRAND and
STRICTLY REPTILES, INC.,

    Defendants.
_____/

**DEFENDANT MICHAEL VAN NOSTRAND'S**
**SENTENCING MEMORANDUM**

Defendant Michael Van Nostrand, through undersigned counsel, respectfully submits this Sentencing Memorandum pursuant to 18 U.S.C. § 3553(a) and states the following:

**INTRODUCTION**

Michael Van Nostrand, along with his wholly owned corporation, Strictly Reptiles, Inc. ("SRI"), is scheduled to be sentenced by this Court on April 19, 2022, after pleading guilty to a one-count Information charging an 18 U.S.C. § 371 conspiracy to purchase and then resell non-endangered, fresh-water turtles that had been wild-caught in violation of Florida Administrative Code 68A-25.002. With a total offense level of 18, Mr. Van Nostrand faces an advisory guidelines range of 27 to 33 months' imprisonment. Taking into consideration the factors under 18 U.S.C. § 3553, however – chief among them, Mr. Van Nostrand's previous and recent cancer diagnosis and severe medical risks, the need to avoid sentencing disparities, the significant collateral consequences of SRI's contemporaneous plea and sentencing, and the circumstances of the offense – we respectfully urge this Court to impose a noncustodial sentence for Mr. Van Nostrand under

which he would serve a period of home confinement, complete at least 250 hours of community service, and (through SRI) pay a meaningful fine.

## DISCUSSION

A.    **History and Characteristics of the Defendant**

Section 3553 recognizes that a defendant's history and characteristics may support a downward variance and should be afforded the same weight as the nature and circumstances of the offense. *United States v. Rodriguez*, 724 F. Supp. 1118, 1119 (S.D.N.Y. 1989). To that end, a defendant's age and health are "valid considerations because they relate to the 'history and characteristics of the defendant.'" *United States v. Gray*, 453 F.3d 1323, 1325 (11th Cir. 2006).

On the issue of health, by all accounts, Mr. Van Nostrand, at 55 years old, is not a well man. In August 2015, he was diagnosed with "aggressive renal cell carcinoma to his left kidney." *See* Apr. 8. 2022 Letter from E. Pachter (attached as Exhibit A). He then underwent radical nephrectomy surgery to remove the cancerous left kidney – leaving him with a right kidney with decreased functionality. *Id.*

In November 2021, doctors discovered a "suspicious mass" on Mr. Van Nostrand's right kidney. *Id.* Doctors performed a biopsy in December 2021, "which revealed Renal Cell Carcinoma of the right kidney." *Id*. Mr. Van Nostrand's doctors recommended that he undergo ablation surgery. *Id.* Because of the dramatic uptick in COVID cases due to the Omicron variant and the ensuing surgical delays at local hospitals, Mr. Van Nostrand's surgery did not occur until February 2022. On February 28, 2022, Dr. Anastas Nenov performed a "Cryoablation of the Right Renal Cell Carcinoma." Mr. Van Nostrand was discharged from the hospital two days later. *See* Mar. 16, 2022, Letter from K. Gernaga (attached as Exhibit B). As a result of the surgery, Mr. Van Nostrand experienced a further "decrease in renal function" in his only remaining kidney. *See* Exhibit A.

Going forward, Mr. Van Nostrand will need to be very closely monitored to ensure that his right kidney is functioning sufficiently and that his renal carcinoma does not recur. *See* Exhibits A & B; PSI at ¶ 85 (DE 30). At a minimum, Mr. Van Nostrand, will require MRI scans every six months, coupled with physical examinations and periodic bloodwork. *See* Exhibits A & B; PSI at ¶ 85. Mr. Van Nostrand's next scan is scheduled for September 2022.

In addition to his kidney issues, Mr. Van Nostrand suffers from chronic atrial fibrillation for which he takes the anticoagulant medication, Warfarin. *See* Mar. 17, 2022, Progress Notes (attached as Exhibit C). As a result, he is required to undergo periodic blood draws and is unable to eat foods high in Vitamin K. *Id.* Mr. Van Nostrand also suffers from chronic hypercholesteremia and chronic hypertension and is on a host of medications to treat those conditions, including Crestor, Cardizem, and Prinivil/Zestril. *Id.* Mr. Van Nostrand also suffers from severe obesity and currently weighs 280 pounds. *See* PSI at ¶ 83 (DE 30).

Given the severity of Mr. Van Nostrand's medical history, constant monitoring is not merely advisable, but essential to his long-term health and survival. Simply missing one MRI could prove catastrophic should his cancer recur and go undetected or untreated. Even aside from his cancer, Mr. Van Nostrand is at an age where his medical conditions, in particular his atrial fibrillation and loss of kidney function – are likely to become more severe. Being away from his treating physicians will only exacerbate his decline, making it all the more likely that he will emerge from prison in much worse physical shape than he is today. Indeed, a 2015 report published by the Office of the Inspector General "found that the average wait time for inmates, including aging inmates, to be seen by an outside medical specialist for cardiology, neurosurgery, pulmonology, and urology to be 114 days." Office of Inspector General, U.S. Dept. of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons* (May

2015), *https://oig.justice.gov/reports/2015/e1505.pdf*. While Mr. Van Nostrand must be punished for his actions, his punishment should not come at the expense of his life or his long-term health. *See United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 2000) (affirming downward departure based in part on the defendant's kidney transplant 20 years earlier and the fact that his new kidney was diseased, requiring routine blood tests and prescription medication); *United States v. Greenwood*, 928 F.2d 645, 645 (4th Cir. 1991) (affirming downward departure where the defendant was a double amputee).

That holds especially true now. The continuing threat of COVID and its variants, which still runs rampant inside BOP facilities, places even greater stress on prison medical facilities already stretched thin. While the BOP takes considerable steps to mitigate outbreaks, the fact remains that the infection rate among inmates is "starkly higher than the nationwide infection rate." *United States v. Aherns*, Case No. 3:11-cr-66, 2020 WL 5097512, at **3-4 (D.N.D. Aug. 28, 2020). "Once the disease infiltrates a correctional facility, inmates possess diminished ability to protect themselves from exposure." *Id.* at *4. Indeed, the COVID Prisoner Project, which compiles up-to-date information on COVID infections in state and federal prisons, notes that "a majority of the largest, single-site outbreaks since the beginning of the pandemic have been in jails and prisons."[1]

Though vaccinated, Mr. Van Nostrand is severely immunocompromised and, with just one kidney, has a significantly greater risk of becoming seriously ill (or worse) should he become infected. *See, e.g.*, *United States v. Gilbert*, 511 F. Supp. 3d 669, 675 (E.D. Pa. 2021) (recognizing, in the context of an application for compassionate release, the extent of the extreme risk the

---

[1] The COVID Prison Project, Apr. 14, 2020, at https://covidprisonproject.com/.

4

defendant faced from COVID given his previous renal cell carcinoma diagnosis). As one court noted:

> although a solitary kidney is not a standalone risk factor, medical studies indicate that the virus frequently "wreaks havoc on the kidneys" and can result in kidney failure—even for otherwise healthy individuals. *United States v. Devino*, 4:11CR3096, 2020 WL 4001195, at *1 (D. Neb. Jul. 15, 2020) (citations omitted); see also Coronavirus: Kidney Damage Caused by COVID-19, Johns Hopkins Med., https://www.hopkinsmedicine.org/health/conditionsanddiseases/coronavirus/coronavirus-kidney-damagecaused-by-covid19 (last visited Aug. 28, 2020). [The defendant's] prior [renal cell] cancer diagnosis and the potential for recurrence also raise concern.

*Aherns*, 2020 WL 5097512, at *3.

The Centers for Disease Control and Protection ("CDC") has outlined a number of underlying medical conditions that place individuals at severe risk from COVID, including: (1) immunocompromised conditions from cancer treatment or other immune deficiencies; (2) chronic kidney disease; (3) serious heart conditions and (4) severe obesity.[2] Mr. Van Nostrand suffers from **all** of these serious underlying conditions – substantially increasing his risk from COVID and justifying a noncustodial sentence.[3] Recognition of these serious medical risks led the Attorney General of the United States in April 2020 to issue a memorandum to the Bureau of

---

[2] CDC, "Groups at Higher Risk for Severe Illness," Apr. 2, 2020, at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

[3] *See, e.g., United States v. Williams*, 17-Cr-121-VAB-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020) (granting compassionate release to a defendant suffering from serious kidney disease, hypertension, and other conditions); *United States v. Jackson*, 14-Cr-00576, 2020 WL 1955402 (S.D. Tex. Apr. 23. 2020) (granting compassionate release to a defendant with serious kidney disease and other conditions); *United States v. Collins*, 2020 WL 7263896, at *1 (D. Kan. Dec. 10, 2020) (granting compassionate release based on defendant's chronic kidney failure, diabetes and prior COVID infection).

Prisons (BOP) on to expand home release reviews to include "all at-risk inmates," as established by CDC medical risk factors.[4]

What's more, the costs BOP will incur to care for Mr. Van Nostrand, with time, are bound to increase exponentially. It costs taxpayers just under $40,000 per year to care for a typical federal inmate. *See* 86 Fed. Reg. 49060 (2021). Because of his medical needs, however, Mr. Van Nostrand is far from typical. It would be much less costly to the BOP and taxpayers to place Mr. Van Nostrand on home detention with electronic monitoring and force him to cover all of his healthcare costs and the costs of electronic monitoring. *United States v. Willis*, 322 F. Supp. 2d 76, 83-85 (D. Mass. 2004) (departing downward based, in part, on the defendant's poor physical health and sentencing the defendant to home confinement).

His health issues aside, Mr. Van Nostrand's life has not always been an easy one. Though close with his parents, his father became addicted to illicit drugs when Mr. Van Nostrand was a teenager. When Mr. Van Nostrand was just 21, his father was indicted on federal drug charges and sentenced to a 5-year term of imprisonment. A college student at the time, Mr. Van Nostrand was forced to drop out of school to run his father's reptile business (which later became SRI). Letters from J. Van Nostrand, Kolene Martinelli. It was not uncommon for Mr. Van Nostrand to work 7 days each week, putting in 18 hours each day, so that he could support his family. Letter from R. Van Nostrand.

---

[4] Memorandum for Director of Bureau of Prisons: Increasing Use of Home Confinement in Institutions Most Affected by COVID-19," Office of Attorney General, Apr. 3, 2020. Https://www.justice.gov/file/1266661/download.

Despite his family's struggles or maybe because of them, Mr. Van Nostrand is a fundamentally kind, compassionate man with a deep love and respect for all living things.[5] As Jeffrey Cerreta. Mr. Van Nostrand's friend of more than 40 years, writes:

> *Mike has no enemies and never met a stranger. He helped numerous people and businesses and charities without any fanfare or recognition, which is how he wanted it.*
>
> *Never have I met a humbler and giving human being. A perfect stranger could ask for his help and he would find a way to do so. Mike never said no in his life to a person in need.*
>
> *A better Father, Husband, Brother, or friend you will not find. I'm honored to have known Mike . . . for over 4 decades.*

To Mr. Van Nostrand, family is everything. Letter from J. Van Nostrand. He is a devoted husband to Michelle, his wife of more than 30 years, and an involved, adoring father to their four children: Alexis (who is 29), Tyler (who is 26), Nicholas (who is 24), and Cameron, (who is just 16). Mr. Van Nostrand has raised each of his children to be "respectful, hard-working young adults," and encourages each of them to pursue their passions, whether it be his daughter's love of horses, his sons' love of baseball, or his youngest son's interest in the Boy Scouts. Letter from K. Tepedelen at 1. He remains incredibly close to his parents and brothers, and is a loving caretaker to his father, who suffers from advanced Alzheimer's Disease. *Id.* at 2. And he has created an extended family, supporting friends and even his employees without nearby families of their own. Letters from R. Ganpat, J. Van Nostrand.

Through sports, Mr. Van Nostrand has taught his children the importance of community and of giving back. One friend even described him as "a backbone to so many folks in the South Florida community." Letter from Kaylene Martinelli. Letter after letter describe how Mr. Van

---

[5] Copies of the letters from Mr. Van Nostrand's friends and supporters are attached collectively, and in alphabetical order, as Exhibit D.

7

Nostrand volunteered his time and energy to help not just the teams that his sons played for, but teams and leagues with which his sons had no affiliation at all. Letters from K. Matthews, K. Tepedelen, P. Barnes. For decades, he coached and mentored players, served as an announcer at their games, raised money for equipment, uniforms, and facility repairs, and even performed many of the repairs himself. Letters from S. Hansley, J. Futch. He also established tutoring programs to ensure that the students succeeded not just athletically, but academically as well. Letter from T. Balter

Among Mr. Van Nostrand's most impactful community involvement was his role as president of Pasadena Park, an underfunded park in Broward County serving predominantly low-income residents. As friend and Miami Beach Police Sergeant Mike Muley explained:

> *At Pasadena Mike Van Nostrand went into the community and recruited coaches like me and started up youth programs to include travel baseball that participated in the Florida Premier Baseball League that was operated by Gaspar Palmer. In addition, to baseball he established three football teams with ages ranging from 9-13 years old that participated The American Youth Football League (A.Y.F.L.). He also started up the cheerleading teams that supported the football teams. Mike Van Nostrand took a park that was put on the back burner of the Pembroke Pines Parks and Recreation Department with poor field conditions and lobbied the local government to invest in the neighborhood and kids and provided them something to be proud of. Mike Van Nostrand did what many only sit back and wait for someone else to do, he vested his personal time in the youth and provided them with an opportunity to be a part of a team and not just hang out in the street. I personally saw the kids that Mr. Van Nostrand saved from the streets and gave them a chance. Several of the kids that participated in baseball and football programs at Pasadena Park went on to play high school sports and earn athletic scholarships to attend college. This opportunity was provided by Mike Van Nostrand and his drive and willing ness to work for the underprivilege kids of the community.*

Letter from M. Muley. *See also* Letter from R. Cappello.

Mr. Van Nostrand's dedication to his community extended well beyond the borders of Pasadena Park. Mario Lopez, one of Pasadena's coaches, writes of Mr. Van Nostrand: "if he knows of a young adult needing work, Mike would always do [h]is best to help them find a job, even if it

8

was a small part-time job. This man has always been so kind and generous to our community." *See also* Letter from M. Perez. A Pasadena parent echoes those statements, writing of how Mr. Van Nostrand – whom she considers "to be a very important role model for our community" – gave her son a job when he couldn't find work. Letter from M. Perez.

But perhaps the most compelling account comes from Dave Risi, an SRI employee. In 2008, Mr. Risi and his wife found themselves homeless and unemployed, forced to rely on their church for food. Hearing their story:

> *[Mike] invited me to work for him, even though we were five hours away! Once a month he paid for my trip expenses and hours worked, and asked for us to move down for full time work. I'm an elevator mechanic by trade, and at that point things were turning around in the economy and there were openings back into my old trade. Mike generously aloud [sic] me to work for him full time until I went back to elevators, and then also on the weekends. He bought me food, was there for me and my wife for whatever we needed him for, and even took me to breakfast before work every Saturday morning for 5 or 6 years! He has always treated me with dignity and respect as a fellow human being . . . .*

Letter from D. Risi. *See also* Letter from R. Van Nostrand (writing of how Mr. Van Nostrand "provided housing" for two employees, paid for an immigration attorney for another, funded medical treatments for others, and gave jobs to people in dire straits).

Aside from his family and his volunteer work, Mr. Van Nostrand's other passion is animals, and in particular, reptiles. He routinely volunteers his time visiting classrooms to educate students on reptiles and the importance of wildlife preservation. Letter from M. Garcia. He shares information with anyone who will listen about "reptiles [and] what makes them and the places they come from unique." Letter from R. Ganpat. And he has helped raise hundreds of thousands of dollars to help with research and conservation. Letter from C. Adams.

9

**B.     The Need to Avoid Unwarranted Sentence Disparities**

Section 3553(a)(6) requires sentencing courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This factor "concerns national disparities between defendants with similar criminal histories convicted of similar conduct. . .." *United States v. Conatser,* 514 F.3d 508, 521 (6th Cir.2008).

According to data collected by the United States Sentencing Commission, defendants similar to Mr. Van Nostrand – those who committed similar offenses during the same time frame, who fell within the same criminal history category, and whose advisory guideline range, calculated in accordance with U.S.S.G. § 2Q2.1, fell within Zone D – saw the following outcomes at sentencing:

- Just over 90% received sentences of 24 months or less
- Of those who were sentenced to terms of imprisonment, 82.6% received sentences of 24 months or less
- Overall, the average length of sentence was 8 months, while the median length of sentence was 5 months
- The average length of imprisonment was 14 months, while the median length of sentence was 6 months.[6]

Consistent with these published statistics, research has uncovered a number of cases, including one relatively recent case before this Court, involving defendants who were involved in the unlawful sale and exportation of wild-caught, ***endangered*** turtles (which the turtles involved

---

[6] A copy of the U.S. Sentencing Commission's Interactive Data Analyzer, from which these statistics were derived, is annexed as Exhibit E.

10

in this case were not), and who received non-incarcerative sentences.[7] In *United States v. Cheung*, Case No. 19-20538-CR-Williams (S.D. Fla.), the defendant pleaded guilty to conspiring, over a two-year period, to illegally capturing and selling endangered turtles subject to federal protection under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES"). Similar to the instant case, Mr. Cheung's guideline range was 24-30 months and the government did not file a §5K1.1 motion for substantial assistance. The retail market value of the sold turtles in *Cheung* also was even larger than here as it exceeded $250,000. Taking into all of these factors, this Court opted to sentence Mr. Cheung to 6 months in prison and three years of supervised release. Cheung's co-defendant, Mr. Pata, received a probationary term of four years. Neither defendant was fined.

Other courts have followed suit. In *United States v. Gangemi*, Case No. 5:18-205 (D.S.C. 2018), the defendant was charged in 2018 with participating in a wide-ranging conspiracy involving the sale of endangered, wild-caught turtles with a retail market value of up to $409,250. The government agreed to cap his loss figure at $40,000, and he was sentenced to two years' probation. The following year, that same defendant was charged in Oklahoma with participating in an entirely separate conspiracy, this one to unlawfully import more than one thousand turtles in violation of the Lacey Act. *United States v. Gangemi*, Case No. 4:19-cr-216 (N.D. Okla. 2019). Yet the government recommended, and the defendant received, a sentence of two years' probation to run concurrent with his sentence in the South Carolina case, along with a $100,000 fine and $250,000 restitution order.

---

[7] These endangered reptiles include Florida box turtles, spotted turtles, North American wood turtles, Eastern Box turtles, Diamondback Terrapins and Blanding's turtles. All of these reptiles are designated as protected animals under CITES.

Even in cases where some period of incarceration is ordered, the sentences tend to be substantially lower than what the government is seeking for Mr. Van Nostrand. In *United States v. Cool*, Case No. 6:21-cr-64 (E.D. Ky.) the court rejected the government's call for a guidelines sentence for a defendant convicted of selling CITES-protected turtles valued at more than $150,000, and instead varied downward and imposed a below-guidelines sentence of 15 months in prison. *See also United States v. Ellard*, Case No. 2:19-cr-28 (M.D. Fla) (defendant who admitted to selling wild CITES-protected turtles was sentenced to 15 months' imprisonment and ordered to pay restitution of $56,000).

Just as a guidelines sentence in this case would create an unwarranted disparity between Mr. Van Nostrand and similarly situated defendants nationwide, it would create an even greater disparity between Mr. Van Nostrand and those he conspired with. Aside from Mr. Van Nostrand, not one person involved in this conspiracy has been charged with any wrongdoing arising out of their participation in it. Indeed, the only members of Mr. Van Nostrand's conspiracy to face charges at all are Henry Ellard, whose unrelated case is discussed above, and Michael Boesenberg, who (like Ellard) was implicated in an earlier and entirely separate conspiracy unrelated to Mr. Van Nostrand. *United States v. Boesenberg*, Case No.1:19-cr-20729-UU (S.D. Fla.). Mr. Boesenberg's scheme involved the sale of 5841 wild-caught turtles, many of which were CITES-protected, with a retail value of more than $530,000, resulting in a guidelines range of 37 to 46 months' imprisonment. Over the government's objection, however, Mr. Boesenberg received a substantial variance and was sentenced to just 18 months' imprisonment with no fine and no restitution.

By contrast, the government is recommending that Mr. Van Nostrand receive a guidelines sentence of between 27 and 33 months in prison – well above what 90% of other wildlife-related

defendants received (even though many of those cases involved more egregious conduct, namely the sale of endangered, CITES-protected animals), and certainly more than his above-mentioned co-conspirators received having never actually been charged for their participation in this conspiracy.

While such a sentence would be unreasonable under normal circumstances, it becomes even more so in the face of the global plea resolution required by the United States in which Mr. Van Nostrand's wholly owned entity, SRI, also had to plead guilty to related charges. Our research indicates that the government's insistence on a corporate plea for this type of offense conduct is virtually unheard of. It also was designed for maximum punitive effect. SRI has been Mr. Van Nostrand's and his family's primary source of income for over twenty years. By pleading guilty, SRI (and with it, Mr. Van Nostrand) already has been forced to suffer severe financial consequences. Because of its plea, SRI had its federal export license revoked on December 27, 2021, which means that the company can no longer export animals for sale outside of the United States. If the past 20 years is prologue, SRI will lose anywhere from $1.1 million to $2.3 million in sales each year as a result. Should the State of Florida follow suit and revoke SRI's state license – and there are strong hints that it may – SRI would be forced to close, leaving Mr. Van Nostrand with no source of income. The enormity of this loss creates the prospect of an even greater sentencing disparity between Mr. Van Nostrand and similarly situated defendants.

The only way to avoid such a disparity would be to impose a below-guidelines sentence for Mr. Van Nostrand. To be sure, we are not asking this Court to sentence Mr. Van Nostrand to probation. We fully understand that Mr. Van Nostrand needs to be punished given the seriousness of the offense. Instead, we are asking this Court to impose a noncustodial sentence that is consistent with the length of sentences imposed nationally in similar cases, which considers the SRI plea and

its impact on Mr. Van Nostrand, and that is proportional to the sentences meted out to Mr. Van Nostrand's co-conspirators.

The government is likely to counter that Mr. Van Nostrand's criminal history justifies an incarcerative guidelines sentence. We disagree. While the PSI references several cases brought against Mr. Van Nostrand and SRI,[8] his criminal history category remains at Category I. Every case, save for one, is at least 25 years old,[9] and only one involved a violation of the Lacey Act, for which Mr. Van Nostrand served 8 months in prison without incident. *United States v. Van Nostrand, et al.,* 97-0074-CR-MOORE. The only case filed this century – a misdemeanor case against SRI – is nearly 15 years old. Just as Mr. Van Nostrand's criminal history does not move him out of Category I, nor does it warrant a sentence at the high end of the range, or even a custodial sentence at all in light of the circumstances. *See, e.g.*, *United States v. Martin*, 1:13-CR-00006-TMB (D. Alaska) (sentencing defendant with substantial criminal past, whose guidelines called for 18 to 24 months' imprisonment, to four years' probation).

**C.     Nature and Circumstances of the Offense**

The case against Mr. Van Nostrand and SRI centers around his participation in a conspiracy to purchase and resell fresh-water turtles (primarily three-striped mud turtles) that were removed from the wild in violation of Florida Administrative Code 68A-25.002. The turtles were sold at wholesale prices to buyers in Louisiana, California, China, and Japan.

---

[8] The mentioned state citations to Mr. Van Nostrand date back to his 20's and involve inspection citations from the State Fish and Game Commission for various violations including the proper locking of cages.

[9] To this, the government will likely point to the state-court misdemeanor charge recently filed against Mr. Van Nostrand in Broward County. For the reasons set forth in the Notice of State Court Misdemeanor Case (D.E. 29) and for additional reasons we will address at sentencing, this unproven charge should not impact Mr. Van Nostrand's sentence in this case.

While the conduct that underlies Mr. Van Nostrand's offense of conviction is unquestionably serious, some context is required. As the Information reflects, Mr. Van Nostrand's conduct violates the federal Lacey Act because the State of Florida now makes it unlawful to remove fresh-water turtles from the wild. In contrast, twenty other states allow these same turtles to be caught in the wild and commercially sold – as Florida once did. Had the turtles been removed, say, from Georgia or even Louisiana where a number of them in this case ultimately were sold, Mr. Van Nostrand would not be standing before this Court for sentencing.

Further, Mr. Van Nostrand's advisory Guidelines – driven not by the money he received, but by the retail market value of the turtles here and in Asia – overstate the seriousness of his offense. Under the terms of his plea, Mr. Van Nostrand agreed to a retail market value of approximately $245,000 which, for the 3,475 turtles sold during this conspiracy, amounts to a retail price of over $70 per turtle. (D.E. 17 ¶ 12). But Mr. Van Nostrand's actual commercial sales prices during the conspiracy were far lower at approximately $40 per turtle on average. *United States v. Simpson*, 538 F.3d 459, 463 (6th Cir. 2008) ("[F]air market value is the price a willing buyer would pay a willing seller at the time of the crime."). Applying that figure, Mr. Van Nostrand's loss amount would have been less than $150,000 and his advisory guidelines two points lower as a result. *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000) ("That the loss overstates the seriousness of the offense is, to use *Koon*'s terminology, an encouraged basis for departure. It was on that sound basis that Judge Barker granted a 2–level departure."). Mr. Van Nostrand's and SRI's actual profit from these turtle sales was even lower as the approximate net profit was around $20 per turtle for a total profit of less than $70,000.

Finally, without minimizing the significance of Mr. Van Nostrand's actions, it is important to recognize that the turtles in this case were not endangered (in contrast to many of the other

federal wildlife prosecutions discussed) and were not mistreated upon sale. That, and a desire to drive up the loss amount, may have been why the government – after uncovering the scheme as part of a sting in 2017 – allowed it to continue for another two years.

## CONCLUSION

For the reasons set forth herein, Defendant Michael Van Nostrand respectfully requests that this Court grant his request for a noncustodial sentence, and instead order Mr. Van Nostrand to serve a period of home confinement, to complete at least 250 hours of community service, and impose a meaningful fine on SRI.

Respectfully submitted,

/s/ Jeffrey E. Marcus
JEFFREY E. MARCUS
Fla. Bar No. 310890
jmarcus@mnrlawfirm.com
KATHRYN A. MEYERS
Fla. Bar No. 0711152
kmeyers@mnrlawfirm.com

**MARCUS NEIMAN RASHBAUM & PINEIRO LLP**
2 South Biscayne Blvd., Suite 2530
Miami, Florida 33131

## CERTIFICATE OF SERVICE

I hereby certify that on April 15, 2022, a true and correct copy of the foregoing was served via CM/ECF on all counsel or parties of record.

/s/ Jeffrey E. Marcus
JEFFREY E. MARCUS