UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.   21-20495-CR-WILLIAMS

UNITED STATES OF AMERICA

v.

MICHHEL VAN NOSTRAND
       and
STRICTLY REPTILES, INC.,

                Defendants.
_____/

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States hereby responds to defendant **MICHAEL VAN NOSTRAND'S** Sentencing Memorandum [D.E.32] filed April 15, 2022, apologizes to this Honorable Court for filing a response so shortly before the scheduled sentencing, and in opposition to the recommendations and statements by defendant would show:

**I.     BACKGROUND.**

On November 3, 2021, the defendants pled guilty to a one-count Information which charged them with conspiring to knowingly export wildlife, specifically various species of wild-caught turtles, knowing that said wildlife were transported and sold in violation of the laws and regulations of the United States, in violation of 18 U.S.C. § 371. Essential to the conspiracy, was the failure to submit the necessary export declarations and other documents, which required as a matter of law that the source of the wildlife be reflected accurately, under penalty of perjury.

Defendants failed to do so, rendering the papers they fraudulently completed and submitted through their co-conspirators legally incompetent.

**MICHAEL VAN NOSTRAND (VAN NOSTRAND)** during all relevant times, and indeed during all prior periods encompassing the past criminal violations of he and his company, was President and co-owner of **STRICTLY REPTILES, INC. (SRI),** a corporation organized under the laws of the State of Florida with its principal place of business in Hollywood, Florida, which was engaged in the domestic and international wholesale trade of wildlife, including Florida-origin fresh-water turtles. The family owned and operated enterprise has approximately 18 employees - including many members of **VAN NOSTRAND**'s family.

The illegal activity was not limited solely to exports from the United States but included illegal sales and transportation activities to Louisiana and California as well.

More than a dozen years ago, the steady decline and intense pressure placed on wild turtles within the State of Florida led to the development of regulatory restrictions on the take of such specimens from the wild, with the intent to limit such harvest for the preservation of the many species being affected by the harvesting activities. A provision was established for the captive breeding of the various species of Florida turtles pursuant to a permit system managed by the State of Florida. The co-conspirators capitalized on that system and used it as cover for their long-term criminal conduct. Despite numerous direct solicitations of specimens that discussed water level conditions, weather, and the season – all considerations[1] irrelevant to a captive breeding facility

---

[1] When returning to **SRI** in the midst of the execution of search warrant by federal and state authorities, **VAN NOSTRAND** opined that the real problem was the Chinese and that he could

– the conspirators feigned compliance with the law, ignorance of the true source of the specimens being trafficked, and utter indifference to the ultimate state of the wild populations.

Defendant **VAN NOSTRAND** now argues for a probationary sentence. He relies primarily on his medical condition, having submitted, belatedly,[2] information documenting the removal of one kidney in 2015, and an ablation procedure on the remaining kidney in February 2022. He also interposes concerns for his well-being from possible Covid pandemic effects should he be incarcerated.

**II.    DISCUSSION.**

**A.  Defendant's Medical History Does Not Warrant A Probationary Sentence.**

Defendant cites to an outdated survey addressing aging prisoners in the federal system to suggest he would not be accorded appropriate medical care within the federal prison system.

Lacking sufficient time to conduct appropriate consultation with medical experts, the government has been severely disadvantaged by the belated submission of the medial data upon which defendant relies. Nonetheless, certain information is readily apparent.

First, defendant's condition is not imminently life-threatening to a degree or in a manner that could be considered extraordinary. Contrary to the apparent self-diagnosis that defendant's

---

help against them – the very destination that he was supplying with large numbers of illegal specimens.

[2] The United States was served electronically with defendant's D.E.-30 on Friday, April 15 at 3:47 pm. Notably, information on **VAN NOSTRAND**'s medical condition date from November 2015 [D.E.-32-1], include a one-paragraph Nurse Practitioner's comments on future MRI scheduling [D.E.-32-2], a report of a "Telemedicine" interview with **VAN NOSTRAND** on March 17, 2022[D.E.-32-3], letters in support of defendant which date back into November 2021 [D.E.-32-4], and USSC Interactive Data Analyzer material [D.E.-32-5].

"medical conditions . . . are likely to become more severe," D.E.-32 at 3, the most recent medical notes suggest his medications and treatment plan are maintaining his condition in satisfactory fashion. The notable requirement from the recent treatment regime is a follow-up MRI every six months, D.E.-32-1, 2, 3, with the next "scheduled" scan contemplated in September 2022. Upon specific inquiry, the Bureau of Prisons has advised that they routinely provide requisite MRI testing. At pre-trial facilities that is usually accomplished under third-party contract, and the results can be provided to personal physicians upon request. At longer-term BOP facilities the equipment may exist on site; if not prisoners are taken to contract medical facilities in the area for that testing.

Defendant quotes the Office of Inspector General Report to the effect that the average wait-time for prisoners for visits to outside medical specialists to be 114 days[3] – which by undersigned counsel's third-grade math equates to less than 4 months. Defendant will have ample time while in custody to schedule and complete his MRI follow-up scans as necessary.

With regard to Covid-19 impacts on the BOP system, much has changed over the past year. Currently over half of BOP's facilities are under only minimal modifications to their normal operating procedures due to the success of earlier efforts, the availability and distribution of vaccinations, and BOP's adoption and integration of guidance and direction from CDC, OSHA, DOJ, and established medical best practices.[4]

---

[3] D.E.-32 at 3.
[4] The Court is free to recommend to BOP that defendant be incarcerated at a facility already lowest level of operational modifications, and even recommend that he be classified to a facility with on-site MRI capabilities to facilitate his treatment.

## B. Defendant's Reliance On Interactive Data Analysis Is Misplaced.

Defendant, under the guise of avoiding "unwarranted disparities"[5] attempts to draw statistical parallels between his case and those in the Sentencing Commission's recently released compilation of case-related date. As interesting as that effort has proven to be there is a glaring omission in the data that negates any direct claim of "similarity." That is because the compilation is of bare numbers – essentially taking a plug-and-play approach if that were the only factor to inform a Court's judgement.

That approach is one that has been derided by Courts since the Sentencing Guidelines were enacted as being too mechanical and failing to tailor sentences to the circumstances of the individual cases. Such an approach, while alluring in the ease of application, undervalues the role of the Court, Probation, and the individualized facts of a case.

Nowhere does the data base account for the recidivism of a defendant. Nowhere does it account for actions such as ensnarling multiple family members in a criminal enterprise. Nowhere does it take into consideration the level of impact the criminal conduct has as a result of the prominence of the participant in a particular field, the depth of their experience, or beyond the basis calculations of participants, the level of direction provided to other coconspirators. While undoubtedly other jurists encountered one or more of these considerations during their sentencing efforts, they are not evident in the data set – so a defendant truly "similar" to the instant defendant may in fact be one sentenced at the upper range of the data set and not at the average or mean.

---

[5] D.E.-32 at 103.

The piecemeal approach chosen by defendant, where he "cherry-picks" only cases to his liking is highly misleading.

In contrast the United States could recite back its own "hit list" of favored cases such as:

In *United States v. Travis Leger et al*, the court sentenced two of the defendants to 21 months and 16 months incarceration respectively for conspiring to violate the Lacey Act. The defendants poached alligator snapping turtles from Texas and resold them in Louisiana. The court also ordered the defendants pay Texas $22,431 in restitution. Case No. 1:17-cr-40, E.D. Tex. (2017).

In *United States v. Keith Cantore*, the court sentenced the defendant to 41 months incarceration and $42,805 in restitution for purchasing wood turtles in violation of the Lacey Act. The defendant therein had a previous conviction for selling turtles. Case No. 2:14-cr-197, E.D. La. (2015).

In In *United States v. John Tokosh*, the court sentenced the defendant to 24 months incarceration   for capturing and exporting purchasing wood turtles to China in violation of the Lacey Act and for employing false labels thereon. The defendant therein had a previous conviction for a similar violation. Case No. 2:15-cr-00028, E.D. La. (2015).

In *United States v. Lawrence Treigle*, Treigle pleaded guilty to conspiracy to violate the Lacey Act. He was part of a group of individuals that captured protected wood turtles from their Pennsylvania habitat and then shipped the turtles to Hong Kong using false package labels, earning over $200,000. The court sentenced him to 15 months incarceration and two years of supervised release. Case No. 2:14-cr-181, E.D. La. (2014).

Beyond the understandably self-serving selection of cases, are the detailed facts, not readily discernable to a non-participant that informed a particular sentence. For example, in *United States v. Cheung*, Case No.19-20538-CR-Williams, well-known to the Court, Mr. Cheung did not, as noted by the defense receive the benefit of a Section 5K1.1 Motion by the government. However, influential in the sentencing process were the facts that from the time he was intercepted by U.S. authorities, Mr. Cheung cooperated, provided assistance, intelligence information, and other aid to the government. While it was less than formal "substantial assistance" it was properly considered by the Court in reaching the sentencing decision. Parenthetically, Mr. Cheung was not a recidivist.

In contrast, defendant herein provided no assistance, refused to facilitate access to his seized electronics, and indirectly caused he investigation to stretch out over a period of years. While all those actions were certainly within his right, they simply serve to reinforce the disparity between his conduct and Mr. Cheung. The Court will also recall that the co-defendant, Michael Pata received his probationary sentence largely on the strength of the Court's granting of the government's *ore tenus* 5K1.1 Motion to Reduce Sentence – a salient fact left unmentioned on the instant Motion. Id. D.E.-42 (Court's minute entry granting government's 5K Motion for Reduction of Sentence). That Motion was predicated on Pata's role as a cooperating individual who developed evidence in an undercover capacity, and one who admitted involvement in the earlier stages of the conspiracy in accordance with an agreement to cooperate (which revealed criminal conduct not otherwise known to the Government).

Defendant's concern that other coconspirators are yet to be indicted in this matter is irrelevant to his conduct, his culpability, and his sentence. Other of the individuals involved, in a subordinate role to this defendant, have had their conduct addressed in elsewhere or are awaiting further action by the government. This is not a closed investigatory matter.

### C.  The Guideline Calculations Do Not Overstate The Seriousness Of The Offense.

Equally misdirected are defendant's attempts to suggest that the various species of wild-caught Florida turtles were freely available in other states to be caught from the wild and sold. That assertion can at best be characterized as a creative ambiguity. In fact, numerous states that possess the same species *also* impose licensing requirements, mandate that collectors report their catches, require sales data, and impose other regulatory restrictions to protect against both illegal conduct and over harvesting. The United States fails to discern a valid argument or excuse in "well it's legal over there . . .". There are a host of conducts legal *somewhere* that we refuse to accept or condone *here.* Whether the quantities and prices secured in Florida could be matched elsewhere is problematic – defendant opted to illegally acquire the species in Florida and then to engage in other criminal conduct to profit therefrom, including but not limited to exporting them contrary to the underlying federal laws dealing with declaration requirements.

Poaching is a threat to the survivability of many turtle species and is "the second largest threat for reptile species worldwide. Among reptiles, turtles and tortoises represent the most

threatened group of vertebrates worldwide."[6] The United States is the second-largest exporter of protected turtles and the largest importer. *Id*.

Defendant also repeatedly, but erroneously, asserts that the cases to which he attempts to find parallels involved more "egregious conduct" ostensibly because they involved endangered animals.[7] These are not endangered species. Yet, endangered species are not species being created – they are species in the course of being destroyed – on their path to either commercial extirpation or biological extinction. Florida in 2009 took measures to present either of those situations from maturing. Defendants and their coconspirators in just 2 years removed almost 3,500 specimens from the wild. Recent case law is rife with criminal prosecutions focused on the extraordinary loss of domestic reptile populations from the United States to the Asian pet trade.

The concern over loss of wildlife underpinning the Florida regulations and the gamut of federal restrictions on wildlife trafficking are given effect by the federal sentencing guidelines. The Commission, since the inception of the Sentencing Guidelines has calibrated the seriousness of the offenses to the "market value" of the wildlife, defined to be "the fair market *retail* price." See USSG §2Q2.1(b)(3)(A), comment. n.4.

The rationale for the Commission's approach is quite simple when structured as an example and bearing in mind the multiple deterrent objectives of the utilitarian ethic of punishment and the specific language in 18 U.S.C. §3553 (a)(2)(A)-(C): a specimen of wildlife at the source has the

---

[6] "A Short Review of the International Trade of Wild Tortoises and Freshwater Turtles Across the World and Throughout Two Decades," L. Luiselli, *et al*. *Chelonian Conservation and Biology* Vol. 15, No. 2 (2016).
[7] This claim appears inter alia at D.E-32 at 11 n.7 and 13.

9

least economic value to be realized – its value is situational. At every step in the movement from source to transporter to each middleman, to wholesaler, to retailer the value becomes enhanced. At each interaction a progressively higher payment changes hands to promote and maintain the chain of supply and satisfy the economic needs of each of the actors. Ultimately the end-user pays the "fair market retail price." Since that price drives the entire criminal process, deterrence at any value lower than that figure encourages, promotes, and maintains the criminal activity and insures it will continue on the basis of fundamental Samuelson economics.

Sanctions commensurate with the economic gain up the chain of criminality recognize the true scope of the conduct and allow for deterrence throughout that chain. The defendants herein suggest their commercial sales occurred at an average of approximately $40 per turtle yet fail to acknowledge that even by that measure they were easily doubling their money due to their low acquisition cost. By applying the Guidelines, as intended by the Commission, and ratified over the many years in force, the Court is merely recognizing the seriousness of the conduct, not overstating it.

### D. Substantial Fines – Payable Immediately - Should Be Levied.

As attested by the PSR [D.E.-30], **VAN NOSTRAND** has amassed considerable wealth from the wildlife trade and is a position to pay a significant fine. **SRI**, too, from the tax return information provided and from the collateral information available, is also a going concern. In this area there is a certain convergence between the government and the defense – although the government doesn't accept the defenses implicit argument that an unspecified "meaningful fine"

on the corporate defendant [D.E.-32 at 16], justifies the issuance of a "get out of jail free" card to the individual defendant.

Defendant concedes in his pleading that for over 20 years the corporate entity was the source of his and his family members' income. Indeed, several of those family members are the very un-indicted co-conspirators referenced in the charging Information. Now, and in the past, the family writ large were the beneficiaries of the criminal conduct. Further, Defendant distorts his actual economic circumstances. While he claims 100% of the expenses of mortgage, utilities, etc., in order to reflect a negative monthly cash flow, this is mis-leading, as his spouse's undisclosed assets and income from a restaurant business should reasonably account for half those liabilities. Tellingly, defendant "accepted" only half the value of major assets such as the residence and some bank accounts while allocating away the remaining half to his spouse.

Defendant would have the Court believe that loss of his import-export license and other potential actions by the State of Florida will be the death knell of the business. Curiously, he fails to mention the steps already taken to avoid just that. A license has for some months been in the name of his son, and trafficking activities on that license, from **SRI**'s premises, have been on-going.

It is also instructive that the convictions for wildlife trafficking in 1997 also resulted in the loss of **VAN NOSTRAND's** import-export license and specific employment restrictions. Yet the corporation lived on – generating income under the theoretical oversight of the other family members.

A significant fine – at the upper end of the Guideline range is warranted herein for several reasons. The most obvious is the deterrent value to both these defendants of removing the economic benefit they derived from illegally trafficking almost 3,500 specimens. To the extent that violators consider the financial implications of their criminal conduct, a lesser fine simply leaves them in a *status quo ante*, essentially untouched economically and able to rationalize their prospective criminal conduct as only a "potential" cost of doing business. Significant fines are also necessary to deter *these* defendants. As noted in the PSR, **VAN NOSTRAND** received sentencing consideration in the past for his cooperation against others. Part of that included a reduction of his personal fine from $7,500 to zero. PSR at 14, ¶ 69, *United States v. Van Nostrand, et al.,* Case no. 97-0074-CR-MOORE, D.E.-87, 95. He never, in fact, met his restitution payment obligations.

Both the defendants are in a position to pay fines that will have a realistic effect on each, and on others similarly inclined to violate the law. As an integral link in the world-wide illegal distribution chain, they feed a market that valued these animals, conservatively, at $245,000. Accordingly, the United States requests this Honorable Court impose a fan individual fine on **VAN NOSTRAND** at the top of the guideline rang - $100,000 and that **SRI** be ordered to pay a fine of $150,000 -less than one-third of the permissible fine.

    **E.  Request That Fine Be Directed to the Lacey Act Reward Fund.**

Congress explicitly authorized fines levied in criminal matters to be directed by the Court to a reward fund established and administered by the Secretary of the Interior, or alternatively, the Secretary of the Treasury. Although the fund is also available to compensate witnesses and

cooperators, its primary utilization has been for the care, treatment, rehabilitation of wildlife pending their disposition at the conclusion of civil and criminal matters. See 16 U.S.C. § 3375(d).

Accordingly, the United States requests this Honorable Court direct all fines imposed in the instant matter with respect to both defendants to the Lacey Act Reward Account which may be directed to the Service's Division of Financial Management at:

> U.S. Fish & Wildlife Service
> Cost Accounting Section
> P.O. Box 272065
> Denver, Colorado 80227-9060

### F.  Related Concern Restrictions Should be Imposed.

The PSR suggests a related concern restriction on defendant **VAN NOSTRAND**, which in the view of the United States is an appropriate measure, but short of that necessary under the facts and circumstances of this case.

As crafted, the restriction [D.e.-30 at 27 ¶125] would limit **VAN NOSTRAND** from owning, operating, consulting with, being employed by or participating in international wildlife trafficking activities. On its face this would appear an effective and far-reaching restriction. It is not.

Over the multiple convictions of defendant and his company, it has become apparent that he excels in his illegal trafficking activities by adopting any guise or excuse that would allow for plausible deniability of the elements of the criminal offense at issue. Currently – his claim and façade was the putative captive breeding facilities of his "collectors." In one past conviction resulting in the forfeiture of almost 7,000 turtles and tortoises, the claim was that the company was ignorant of the end use to which the illegally undersized turtles were being directed an accordingly

had no reason to believe they weren't being used for bona fide educational or scientific purposes.[8] In *United States v. Van Nostrand, et al.,* Case no. 97-0074-CR-MOORE, which involved amongst other conduct the purchase of numerous illegally trafficked wildlife from "luggage carriers," the dodge was to maintain deliberate ignorance by never questioning any of the individuals regarding the origin of eh items they repeatedly brought to the business establishment.

The recitation in the PSR is also insufficient in light of the fact that the criminal conduct encompassed in the charge of conviction involved not only international trafficking, but illegal interstate trafficking as well as intra-state criminal conduct. Defendant should be subject to a related concern restriction that is expanded to include any international or domestic commercial activity involving, directly or indirectly, the purchase, sale, or transfer of wildlife.

A companion restriction should also be place on the codefendant **SRI** for the full span of the five years probationary sentence available to the Court. With three trafficking convictions, the corporate entity should not be permitted to simply resume business operations at the conclusion of three years or rely and count on the return of defendant **VAN NOSTRAND** in the future. A lengthier period with the related concern restriction should induce the company to develop a better atmosphere of compliance and ideally a staff committed to a new corporate culture.

---

[8] The Judgement & Commitment Order in *United States v. Strictly Reptile, Inc.,* Case No. 08-60173-CR-EPD, D.E.-8 at 3 actually imposed as a remedial measure a special notice directed to customers that informed them of the legal restrictions on such trafficking and required **SRI** to acquire executed acknowledgements

**G. Request That Seized, Illegally Obtained Wildlife Be Forfeited.**

Title 16, United States Code, Section 3374(a) renders specimens of wildlife imported, exported, transported, sold, received, acquired, or purchased contrary to the Lacey Act to be subject to forfeiture to the United States.

As a result of the criminal conduct in this matter, the United States remains in possession of a number of the specimens of wildlife illegally traded by the defendants and their co-conspirators. Specifically, the following specimens were seized from the premises of SRI during the execution of a search warrant in 1019 and are being held by the United States:

| | | |
|---|---|---|
| 24 | Three-Striped Mud Turtles | (Kinosternon bauri) |
| 8 | Florida Mud Turtles | (Kinosternon subrubrum steindachneri) |
| 4 | Eastern Mud Turtles | (Kinosternon subrubrum) |
| 6 | Common Musk Turtle | (Sternotherus odoratus) |

The United States request the entry of a forfeiture order with respect to the foregoing specimens.

**III. Conclusion.**

Based on the foregoing discussions and authorities, the United States respectfully requests that this Honorable Court sentence defendants **MICAHEL VAN NOSTRAND** and **SRI** as described herein.

        Respectfully submitted,

        JUAN ANTONIO GONZALEZ
        UNITED STATES ATTORNEY

        By: /s/ Thomas A. Watts-FitzGerald
            Assistant United States Attorney
            Florida Bar No. 0273538

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Response was served on February 18, 2022, via the Court's electronic filing system on all parties of record.

By: /s/ Thomas A. Watts-FitzGerald
Assistant United States Attorney